938 F.2d 1553
 UNITED STATES of America, Appellee,
v.
James COONAN, Kevin Kelly, James McElroy, Kenneth Shannon,
William Bokun, John Halo, Edna Coonan, Richard
Ritter, Thomas Collins, Florence
Collins, Defendants,
Kevin Kelly, Defendant-Appellant.
 No. 280, Docket 90-1223.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 4, 1991.
Decided July 16, 1991.
 
 Vivian Shevitz, New York City (Georgia J. Hinde, of counsel), for defendant-appellant.
 Laurie E. Brecher, Asst. U.S. Atty., S.D. New York (Otto G. Obermaier, U.S. Atty., David E. Brodsky, Helen Gredd, Asst. U.S. Attys., S.D. New York, of counsel) for appellee.
 Before NEWMAN and ALTIMARI, Circuit Judges, and CONBOY, District Judge.*
 ALTIMARI, Circuit Judge:
 
 
 1
 Defendant-appellant Kevin Kelly appeals from a judgment of conviction, entered in the United States District Court for the Southern District of New York, following a jury trial before Judge Whitman Knapp.
 
 
 2
 In a seventeen count indictment, Kevin Kelly and co-defendants James Coonan, Edna Coonan, Thomas Collins, James McElroy, Richard Ritter, Florence Collins, William Bokun, John Halo and Kenneth Shannon were charged with various offenses arising from their participation in a racketeering enterprise. After a five-week trial, Kelly was convicted of participating in and conspiring to participate in a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Secs. 1962(c) & (d) (1988). Kelly was also convicted of attempted murder and assault for the purpose of maintaining and increasing his position in the racketeering enterprise, in violation of 18 U.S.C. Sec. 1952B (Supp. V 1987) (subsequently renumbered as 18 U.S.C. Sec. 1959 (1988)); conspiracy to make extortionate extensions of credit, in violation of 18 U.S.C. Secs. 891 & 892 (1988); conspiracy to use extortionate means to collect extensions of credit, in violation of 18 U.S.C. Secs. 891 & 894 (1988); conspiracy to distribute cocaine, in violation of 21 U.S.C. Sec. 846 (1988); and conspiracy to commit extortion in violation of 18 U.S.C. Sec. 1951 (1988). Kelly was acquitted of conducting a gambling business, in violation of 18 U.S.C. Sec. 1955 (1988). As a consequence of these convictions, Kelly was sentenced to fifty years of imprisonment.
 
 
 3
 On appeal, Kelly challenges his RICO convictions, contending that there was insufficient evidence to support the jury's finding of a racketeering enterprise and arguing that RICO is unconstitutionally vague. Further, Kelly claims that his conviction violated principles of double jeopardy as well as RICO's statutory language because one of the predicate acts of racketeering charged in the indictment was a crime of which he had previously been acquitted in state court. Kelly also complains that his conviction was based in large part on unreliable evidence that he was precluded from challenging. Finally, Kelly attacks his sentence as improperly cumulative.
 
 
 4
 For the reasons stated below, we affirm the judgment of conviction on all counts.
 
 BACKGROUND
 
 5
 Defendant-appellant Kevin Kelly and his nine co-defendants were charged with racketeering and various other offenses related to their participation in the affairs of the "Westies" (also known as "Coonan's Crew," the "Westside Guys," and the "Westside Irish Mob"), an organized crime group based in the Hell's Kitchen section of Manhattan. Although Kelly did not join the Westies until the late 1970s or early 1980s, an overview of the criminal organization's history is essential to understanding the specific charges at issue. The following facts and inferences can reasonably be drawn from the evidence adduced at trial.
 
 1. The Westies Rise to Power
 
 6
 The Westies were formed in the mid-1960s when James Coonan and his confederates attempted to wrest control of criminal activity in Hell's Kitchen from the then predominant gang leader, Michael "Mickey" Spillane. Coonan was ultimately victorious in his efforts to drive Spillane from power and seize control of the West Side. Throughout the 1970s and early 1980s, the Westies, under Coonan's leadership, maintained and expanded their position as the preeminent organized crime group in Hell's Kitchen. By the mid-1970s, Francis "Mickey" Featherstone had become Coonan's righthand man and the Westies' second-in-command. The Westies' money-making activities centered around loansharking, narcotics dealing, extorting local labor unions and controlling New York's West Side piers. In conducting their various illicit businesses, Coonan and his gang routinely engaged in extreme acts of violence and effectively cultivated a reputation for barbarism. For example, in January 1978, Coonan, and fellow Westies, Mickey Featherstone and Anton "Tony" Lucich, murdered and dismembered Richard Tassiello, a loansharking customer who had fallen behind in his payments. In May 1977, in a similarly macabre incident, Coonan, William "Billie" Beattie and other members of the Westies, murdered and dismembered Charles "Ruby" Stein, a loansharking financier to whom Coonan owed a substantial sum of money.
 
 
 7
 In the late 1970s, the Westies' power was further enhanced when it entered into an alliance with the Gambino Organized Crime Family. The Gambinos agreed to finance the Westies' loansharking operation and also permitted the Westies to use the Gambino name and reputation in connection with their own illicit businesses. In exchange, the Westies paid the Gambino Family ten percent of the proceeds from various illegal activities.
 
 
 8
 At trial, the government established that Kelly's participation in the Westies began in the late 1970s. The evidence against Kelly concerned several specific areas of criminal activity and criminal acts.
 
 2. The Westies' Loansharking Operation
 
 9
 In the mid-1970s, Coonan established a loansharking business through which he supplied money at high rates of interest to Westies members. In turn, the members loaned money at usurious rates of interest to inhabitants of the Hell's Kitchen community. Although Kelly initially served as a collector and enforcer for other gang members, he was eventually rewarded with his own loansharking operation. Consistent with the Westies' reputation, Kelly utilized violence to ensure that his loansharking customers kept up their payments. For example, Kelly and fellow Westie Kenneth Shannon dealt with one delinquinent loansharking customer by stripping and beating the customer, and then leaving him tied to a tree. In another incident, Kelly and fellow Westie James McElroy, pistol-whipped a loansharking customer for missing his payments and for making disparaging remarks about the Westies.
 
 3. The Westies' Cocaine Conspiracies
 
 10
 From 1984 until 1986, the Westies were involved in four interrelated cocaine distribution operations. Kelly and two other Westies members were primarily responsible for control of cocaine distribution in bars located on the Upper East Side of Manhattan. Kelly also lent assistance to other gang members who operated their own cocaine distribution operations. In particular, Kelly supplied both cocaine and financing to his fellow gang members, and helped them collect debts.
 
 
 11
 4. The Murder of Vincent Leone and the Conspiracy to Extort ILA Local 1909
 
 
 12
 Vincent Leone was an officer of Local 1909 of the International Longshoremen's Association ("ILA") and an associate of the Gambino Family. The Gambinos assigned Leone to help the Westies oversee criminal activities on the West Side piers, where members of Local 1909 worked. In November 1983, the Westies discovered that Leone had been skimming money from the profits generated on the piers. Consequently, Coonan, who was then in prison, sent word through his wife Edna that Leone was to be killed. At the same time, Coonan ordered the murder of a Westie who had defied him and also instructed that another Westie was to be "put out of business." As directed, Edna Coonan approached Mickey Featherstone and offered him "control of the piers" if he would undertake the assignment. Featherstone refused. Several days later, however, Featherstone mentioned Coonan's request to Kelly and McElroy. Kelly expressed interest and, accompanied by McElroy, visited Coonan in prison. During their prison meeting, Coonan confirmed that he wanted Leone killed and promised Kelly and McElroy control of the piers if they engineered the murder and convinced Featherstone to assist in overseeing waterfront criminal activity.
 
 
 13
 On February 11, 1984, Leone was driving in his car with Kelly and McElroy. Either Kelly or McElroy asked Leone to pull over. When the car stopped, Kelly shot Leone six times in the head. After the shooting, Kelly and McElroy fled the scene in a car driven by fellow Westie William "Billie" Bokun.
 
 
 14
 Following Leone's murder, Coonan instructed Kelly and McElroy to meet with Local 1909 officials Thomas Ryan and John Potter. At the meeting, Kelly accused Ryan of working with Leone to skim money that belonged to the Westies. Kelly also conveyed Coonan's instruction that henceforth Potter was to take responsibility for the money being paid from the ILA to the Westies. Accordingly, Potter began making weekly payments to Kelly, who shared the proceeds with Coonan, Featherstone, McElroy and Shannon. After Coonan was released from prison in late 1984, he began collecting the money himself and distributing the funds to his fellow Westies, including Kelly.
 
 
 15
 5. Extortion of Teamster's Local 817 and the Conspiracy to Murder John "Jackie" Lynch
 
 
 16
 Prior to 1980, Local 817 of the International Brotherhood of Teamsters' (known as the "Theatrical Teamsters") office was located at Ninth Avenue and Forty-Second Street in the heart of Hell's Kitchen. Local 817 subsequently moved its office to Long Island, with no apparent affect on the criminal conduct discussed below. Members of the Theatrical Teamsters generally were employed in various jobs within the entertainment industry, such as transporting movie and television production equipment to filming locations within New York City.
 
 
 17
 Throughout the 1980s, the Westies extorted jobs and union memberships from the officers of Local 817. On one particular occasion, the president of the Theatrical Teamsters told Coonan and McElroy that the union's membership rolls were full. In response, the two Westies threatened to kill one member of the Local per week until the ranks were sufficiently thinned to accommodate the gang members. On a different occasion, Kelly and McElroy assaulted two union officials who reneged on a promise to provide union membership cards to certain Westies.
 
 
 18
 Sometime during 1984, John "Jackie" Lynch, a disgruntled union member and Westies loansharking customer, threatened to kidnap "Whitey" McAvoy, a Local 817 official who was under the Westies' protection. Shortly thereafter, while in a bar on the West Side, Lynch attempted to shoot McAvoy. An off-duty police officer, who happened to be on the scene, prevented the shooting and arrested Lynch. Following this event, Kelly, Featherstone and Beattie plotted to kill Lynch for terrorizing "their people." They decided that Beattie would carry out the killing, and Kelly accordingly provided him with a gun and silencer. The plan was abandoned, however, when Lynch was convicted and sent to prison on charges of criminal possession of a firearm.
 
 6. The Shooting of John O'Connor
 
 19
 In April 1985, Coonan and McElroy learned that the Gambino Family wanted to have John O'Connor, an officer of Carpenters' Local 608, "kneecapped," i.e., injured but not killed. Apparently, O'Connor had caused difficulties on a construction site that was under Gambino Family protection. Coonan and McElroy offered to handle the job for the Gambinos. As a result, Kelly, McElroy and Shannon planned the shooting. In the early morning of May 7, 1986, Kelly waited for O'Connor outside his office building. When O'Connor arrived, Kelly followed him inside and shot him in the back. O'Connor survived the shooting.
 
 
 20
 7. The Murder of Michael Holly and the Demise of the Westies
 
 
 21
 The seeds of the Westies' demise were planted on March 25, 1977. On that date, John Bokun, a friend of several Westies, was arguing with Michael Holly, a Hell's Kitchen resident, outside a bar. John Bokun suddenly drew a gun and shot Holly in the chest. An off-duty police officer happened to witness the shooting and attempted to intercede. Bokun responded to these efforts by firing several shots at the officer. The officer returned the gun fire, fatally wounding Bokun. Holly survived the incident. From that day forward, the Westies held Holly responsible for the death of John Bokun. On various occasions thereafter, the Westies plotted to avenge John Bokun's death. The plans were repeatedly aborted, until 1985 when Coonan directed several members of the Westies to kill Holly. Kelly, Shannon and Billie Bokun (John Bokun's brother) planned the killing. On April 25, 1985, at midday, Bokun, wearing a disguise, approached Holly on a crowded street and fired five bullets into his back. Bokun then escaped in a get-away car driven by Shannon.
 
 
 22
 The following day, Featherstone was arrested and eventually charged with the murder of Michael Holly. Featherstone was linked to the crime by two eyewitnesses and a variety of circumstantial evidence. In the spring of 1986, Featherstone went to trial in state court and was convicted. After the conviction, Featherstone and his wife, Marcelle ("Sissy") Featherstone, continued to insist that Featherstone was innocent and eventually agreed to cooperate with law enforcement authorities' efforts to investigate the Westies and perhaps to expose Holly's actual killers. As a result of Featherstone and his wife's cooperation, the government was able to amass substantial evidence of the Westies' criminal activities and to obtain the underlying indictment. The investigation also conclusively established that Featherstone was not involved in the murder of Holly and, therefore, his state conviction was set aside.8. The Westies Trials
 
 
 23
 Eight of the co-defendants named in the indictment, including James Coonan, Edna Coonan, James McElroy, and Billie Bokun, were tried before Judge Knapp and a jury. All but one of the defendants were convicted. The convictions were summarily affirmed by this Court. See United States v. Coonan, 876 F.2d 891 (2d Cir.1989) (order), cert. denied, --- U.S. ----, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989).
 
 
 24
 Because Kelly was a fugitive at the time of the first Westies trial, he was not tried with his co-defendants. Subsequently, Kelly surrendered to authorities and was brought to trial before Judge Knapp and a jury. The jury ultimately returned a guilty verdict on all charges against Kelly, except on the charge of conducting an illegal gambling business. This appeal followed.
 
 DISCUSSION
 
 25
 1. Kelly's Challenges Based on RICO's Enterprise Element
 
 
 26
 In a scatter shot argument, Kelly contends that his RICO convictions must be set aside because: (a) the government offered insufficient proof of the existence of the charged "enterprise" and of Kelly's participation in that enterprise; (b) the evidence offered to prove the existence of the RICO enterprise was unduly prejudicial; and (c) RICO's enterprise requirement is unconstitutionally vague.
 
 
 27
 a. Sufficiency of the Enterprise Evidence
 
 
 28
 Kelly's claims of insufficient evidence focus exclusively on the "enterprise" element of the RICO charges. He contends that the evidence adduced at trial merely established a structureless and shifting assemblage of individual criminals and failed to demonstrate the existence of a unified and continuing organization. Kelly also asserts that the proof failed to establish his association with and participation in the Westies.
 
 
 29
 The standards for reviewing challenges to the sufficiency of the evidence are well established. "A conviction must be allowed to stand if, 'after viewing the evidence in the light most favorable to the prosecution,' the reviewing court finds that 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)), cert. denied, --- U.S. ----, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). In other words, where substantial evidence supports a jury's verdict, it must be allowed to stand. Casamento, 887 F.2d at 1156; United States v. Nersesian, 824 F.2d 1294, 1324 (2d Cir.), cert. denied, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Furthermore, in considering such claims, we examine the evidence adduced at trial in its entirety and credit all reasonable inferences that can be drawn in favor of the prosecution. United States v. Weiss, 930 F.2d 185, 191 (2d Cir.1991); United States v. Parker, 903 F.2d 91, 96 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990); Casamento, 887 F.2d at 1156.
 
 
 30
 As noted above, Kelly grounds his insufficiency challenge on the prosecution's alleged lack of evidence of a RICO enterprise. RICO defines "enterprise" as, inter alia, "any ... group of individuals associated in fact although not a legal entity." 18 U.S.C. Sec. 1961(4) (1988). The Supreme Court has explained that a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); see United States v. Bagaric, 706 F.2d 42, 55 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by "what it does, rather than by abstract analysis of its structure." Bagaric, 706 F.2d at 56 (emphasis in original); see, e.g., United States v. Mazzei, 700 F.2d 85, 88-89 (2d Cir.), cert. denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983). Thus, we have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise. United States v. Ferguson, 758 F.2d 843, 853 (2d Cir.) (proof used to establish predicate acts and enterprise may coalesce), cert. denied, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985); Bagaric, 706 F.2d at 57 (same); see also United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir.) (in banc) ("the difference in the nature of the [pattern and enterprise] elements does not mean that the same piece of evidence may not help to establish both."), cert. denied, --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).
 
 
 31
 A review of the record clearly demonstrates that overwhelming proof of the charged enterprise, and Kelly's participation in that enterprise, was presented to the jury. Several former Westies members and associates provided testimony regarding the enterprise's hierarchy, organization and activities. Both Mickey Featherstone and Billie Beattie testified that the Westies was an organization that engaged in, among other things, the crimes of murder, loansharking, extortion and drug dealing. Coonan was identified as the organization's leader and Featherstone as its second-in-command. At various times its membership also included, among others, Kevin Kelly, James McElroy, Billie Beattie, Kenneth Shannon and Billie Bokun. Further, Featherstone and Beattie each explained that the Westies had an informal structure based around an "inner crew"--of which Kelly was ultimately a member--that controlled most organized criminal activities in Hell's Kitchen. This depiction of the Westies enterprise was further corroborated by Sissy Featherstone and Alberta Sachs, James Coonan's niece.
 
 
 32
 Evidence was also presented detailing the specific activities in which the Westies were engaged. For example, Featherstone, Beattie and Sachs each testified about the enterprise's loansharking operation and cocaine distribution organization. According to the testimony, these illicit businesses were conducted under the direction of Westies members and were overseen by Coonan. Similarly, there was ample evidence demonstrating that the Westies, as an ongoing association-in-fact, controlled criminal activities on the West Side piers, and extorted jobs and payments from several labor unions. Further, the government showed that the Westies entered into an alliance with the Gambino Organized Crime Family, suggesting that other criminal organizations perceived the Westies as an ongoing enterprise.
 
 
 33
 With respect to Kelly, the evidence revealed that his association with the Westies began sometime during the late 1970s. In 1978, Coonan arranged for Kelly's unusually prompt acceptance as a member in Local 817--a process which ordinarily took ten to fifteen years. Thereafter, Kelly was employed as a collector and enforcer in the Westies' loansharking business and eventually was rewarded with his own loansharking operation. In addition, Kelly controlled the Upper East Side segment of the Westies cocaine distribution syndicate and assisted other Westies in the operation of related cocaine distribution conspiracies. Further, while Coonan was in prison, Kelly was responsible for collecting weekly payments from John Potter, an officer of ILA Local 1909. The evidence also showed that on several occasions Kelly received orders from Coonan, or his emissaries, directing that certain actions be taken on the Westies' behalf. For example, at Coonan's behest, Kelly planned and participated in the murders of Vincent Leone and Michael Holly, and the shooting of John O'Connor.
 
 
 34
 Despite all of the foregoing, Kelly contends that, as a consequence of Coonan's imprisonment, the Westies ceased to exist in the early 1980s. The contention is without merit. As illustrated above, even while in jail Coonan continued to act as leader of the Westies and the Westies' criminal activities continued without significant disruption. Similarly unpersuasive is Kelly's assertion that the Westies' violent in-fighting somehow proves that the Westies was never a cohesive, ongoing association. As discussed above, the evidence clearly established that, regardless of internal disputes and membership changes, the Westies' power structure endured and its members functioned as a unit up until the time that Mickey Featherstone's cooperation with the government was revealed.
 
 
 35
 b. Prejudice Flowing From Enterprise Evidence
 
 
 36
 Kelly asserts that he was unfairly prejudiced by the admission of evidence regarding Westies' criminal activities that occurred prior to his membership in the gang. In particular, Kelly complains that several witnesses were permitted to testify about gruesome murders and dismemberments committed by the Westies in the 1970s.
 
 
 37
 Although Kelly strenuously argues that he was prejudiced by various portions of the government's enterprise evidence, during the course of trial Kelly repeatedly failed to object to the admission of the evidence he now seeks to challenge. See Fed.R.Evid. 103(a)(1). Indeed, as the government points out, at times Kelly actually welcomed the admission of the macabre details of the Westies' criminal acts. Kelly apparently hoped to convince the jury that, although he might have engaged in certain illegal conduct, he did not exhibit the type of violence and brutality that signified membership in the Westies. Consequently, the defense not only conceded the existence of the Westies but attempted to portray the enterprise in the most brutal terms possible. Viewed from this perspective, it is fairly obvious that on this appeal Kelly is attempting to evade the consequences of an unsuccessful tactical decision. Under these circumstances, we have no difficulty concluding that Kelly has waived appellate review of this evidentiary claim. See United States v. Weiss, 930 F.2d at 198; United States v. Heinemann, 801 F.2d 86, 96 (2d Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).
 
 
 38
 Even if we were persuaded to reach the merits of Kelly's argument, it appears that the evidence was properly admissible on several grounds. First, despite its prejudicial impact, the evidence was certainly probative of the existence of the charged enterprise. Second, as this Court has previously stated:
 
 
 39
 [T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.
 
 
 40
 United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); see United States v. Pedroza, 750 F.2d 187, 200 (2d Cir.1984). Third, since the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility. In this manner, the prosecution was able to avoid the appearance that it was concealing impeachment evidence from the jury. See United States v. Louis, 814 F.2d 852, 856 (2d Cir.1987). Thus, although we need not address the propriety of admitting the challenged evidence, we note that Kelly's claim is dubious at best.
 
 
 41
 c. Constitutionality of RICO's "Enterprise" Requirement
 
 
 42
 Also unavailing is Kelly's contention that his racketeering convictions must be overturned because RICO's enterprise requirement, 18 U.S.C. Sec. 1962(c) & (d), is unconstitutionally vague and fails to give notice of the conduct prohibited by the statute. See United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). In particular, Kelly asserts that the enterprise element of the statute is "so vague and ... so elastic that it permits unbridled and arbitrary prosecutorial choices and irrelevant and prejudicial proof." We disagree.
 
 
 43
 A statute is unconstitutionally vague if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); see Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). In the absence of first amendment considerations, vagueness challenges must be evaluated based on the particular application of the statute and not "on the ground that [the statute] may conceivably be applied unconstitutionally to others in situations not before the Court." New York v. Ferber, 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982); see United States v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). Thus, to succeed on his vagueness challenge, Kelly must demonstrate that the statute, as applied, failed to adequately warn of the prohibited conduct.
 
 
 44
 In the present case, Kelly had more than adequate notice that the Westies was an enterprise which fell within RICO's ambit. The statute clearly indicates that an enterprise includes a "group of individuals associated in fact," 18 U.S.C. Sec. 1961(4), that is, "a group of persons associated together for a common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 583, 101 S.Ct. at 2528. It is patently obvious that the Westies was such an association. Moreover, "RICO was plainly intended to encompass the illegal activities of organized crime" and the Westies was the very type of organization that Congress intended to eradicate through the adoption of RICO. United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); see Turkette, 452 U.S. at 588-93, 101 S.Ct. at 2531-34; United States v. Ruggiero, 726 F.2d 913, 923 (2d Cir.), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). In sum, the statute is not unconstitutionally vague as applied to Kelly.
 
 
 45
 2. The Use of Prior State Acquittals as Predicate Acts of Racketeering
 
 
 46
 Kelly next argues that his RICO convictions must be set aside because one of the predicate acts of racketeering charged in the indictment, and found proven by the jury, was a crime for which he had previously been acquitted in state court. Specifically, in state court, Kelly was acquitted of the murder of Michael Holly. Despite this fact, in Racketeering Act 16 of the underlying indictment, the government charged that "Kevin Kelly ... unlawfully, willfully and knowingly did murder Michael Holly." According to Kelly, this successive prosecution for the Holly murder violates both the constitutional prohibition against double jeopardy and the statutory language of RICO. We disagree with both contentions.
 
 
 47
 a. Double Jeopardy and Dual Sovereignty
 
 
 48
 It is well-settled that the double jeopardy clause "protects against a second prosecution for the same offense after acquittal." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); see also Grady v. Corbin, --- U.S. ----, 110 S.Ct. 2084, 2090-91, 109 L.Ed.2d 548 (1990); United States v. Persico, 832 F.2d 705, 710 (2d Cir.1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1995, 1996, 100 L.Ed.2d 227 (1988). Equally well-established is the doctrine of dual sovereignty which holds that a state prosecution does not bar a subsequent federal prosecution of the same person for the same act. United States v. Wheeler, 435 U.S. 313, 316-17, 98 S.Ct. 1079, 1082-83, 55 L.Ed.2d 303 (1978); Abbate v. United States, 359 U.S. 187, 194-95, 79 S.Ct. 666, 670-71, 3 L.Ed.2d 729 (1959); see also Heath v. Alabama, 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). The dual sovereignty doctrine essentially recognizes that "prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.' " Wheeler, 435 U.S. at 317, 98 S.Ct. at 1083. As the Supreme Court explained in United States v. Lanza:
 
 
 49
 Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
 
 
 50
 It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.
 
 
 51
 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922), quoted in Heath, 474 U.S. at 89, 106 S.Ct. at 437 and Abbate, 359 U.S. at 194, 79 S.Ct. at 670. Consequently, the fact that Kelly was acquitted in state court of Holly's murder did not preclude the federal authorities from charging that very same offense as a predicate act in the subsequent RICO action. United States v. Russotti, 717 F.2d 27, 30-32 (2d Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); accord United States v. Farmer, 924 F.2d 647, 649-50 (7th Cir.1991); United States v. Pungitore, 910 F.2d 1084, 1105-06 (3rd Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); United States v. Licavoli, 725 F.2d 1040, 1047 (6th Cir.), cert. denied, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984).
 
 
 52
 The dual sovereignty doctrine, however, is not without exception. In United States v. Russotti, we indicated that circumstances may exist in which state and federal prosecutions are so intertwined as to undermine the assumption that two supposedly independent criminal actions were prosecuted by separate sovereigns. See Russotti, 717 F.2d at 31; see also United States v. Aleman, 609 F.2d 298, 309 (7th Cir.1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); see also Pungitore, 910 F.2d at 1106 & n. 20. The key criterion in determining whether the application of this exception is warranted "[is] not the extent of control exercised by one prosecuting authority over the other but rather the ultimate source of the power under which the respective prosecutions were undertaken." Wheeler, 435 U.S. at 320, 98 S.Ct. at 1084; cf. Heath, 474 U.S. at 88-89, 106 S.Ct. at 437; Abbate, 359 U.S. at 195, 79 S.Ct. at 671; Bartkus v. Illinois, 359 U.S. 121, 122-25, 79 S.Ct. 676, 677-79, 3 L.Ed.2d 684 (1959).
 
 
 53
 Here, there undeniably was cooperation and coordination between the state and federal authorities. However, no basis exists to conclude, as Kelly argues, that the state prosecutors were not acting independently when they indicted and prosecuted him. As in Bartkus v. Illinois, the record in this case establishes
 
 
 54
 that the prosecution was undertaken by state prosecuting officials within their discretionary responsibility.... It establishes also that federal officials acted in cooperation with state authorities, as is the conventional practice between the two sets of prosecutors throughout the country. It does not support the claim that the [state] in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment.... It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.
 
 
 55
 Bartkus, 359 U.S. at 123-24, 79 S.Ct. at 678 (footnotes omitted); see also Russotti, 717 F.2d at 31; Aleman, 609 F.2d at 309. In sum, the dual sovereignty doctrine is fully applicable to the present case.
 
 
 56
 Additionally, Kelly is simply in error when he asserts that principles of double jeopardy bar the use of conduct that was the subject of a prior prosecution as a predicate act in a subsequent RICO prosecution. In this Circuit, the permissibility of such subsequent RICO prosecutions, at least in cases involving racketeering activity occurring after the initial prosecution, is well established. United States v. Gambino, 920 F.2d 1108, 1112 (2d Cir.1990); United States v. Scarpa, 913 F.2d 993, 1013-14 n. 8 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990); see United States v. Persico, 832 F.2d at 711 (leaving open the issue of whether it is necessary to show conduct that post-dates the first prosecution to defeat a double jeopardy challenge); id. at 719 (Newman, J., concurring in relevant part) (suggesting that "the pertinent date is the last date of the predicate offense"); see also United States v. Persico, 774 F.2d 30, 32 (2d Cir.1985).
 
 
 57
 b. RICO's Statutory Language
 
 
 58
 Kelly's statutory language argument is based on the definition section of RICO, which provides that racketeering activity means "any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. Sec. 1961(1)(A) (emphasis added). Kelly asserts that a crime for which he has already been acquitted in state court is no longer "chargeable under State law" because further state prosecution would be barred by the double jeopardy clause. Therefore, according to Kelly, Michael Holly's murder cannot serve as a predicate act of racketeering. See id. Sec. 1961(1)(A) & (5). Kelly's argument misperceives the function of State law violations in federal racketeering prosecutions.
 
 
 59
 We have previously considered the meaning of RICO's "chargeable under State law" requirement, albeit in a slightly different context. See United States v. Friedman, 854 F.2d 535, 565-66 (2d Cir.1988), cert. denied, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); United States v. Paone, 782 F.2d 386, 393-94 (2d Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986). In United States v. Paone, appellant Marino was convicted of a RICO violation; six of the predicate acts underlying the indictment were New York State law offenses of murder, attempted murder and attempted arson. At trial, the charges were proven exclusively by accomplice witness testimony. On appeal, Marino argued that, since New York law requires corroboration of accomplice testimony to prove these offenses, such acts were not "chargeable under State law" and therefore did not comply with the definition of "racketeering activity" under RICO. Id. at 393. We rejected this argument, stating:
 
 
 60
 We are satisfied that Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute. The statute is meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge.
 
 
 61
 Id. (emphasis added).
 
 
 62
 We next confronted this issue in United States v. Friedman, where appellant's RICO conviction was predicated on the payment of two bribes in violation of New York law. Appellant argued that the bribes did not constitute two predicate acts because they were part of a single act or criminal transaction and could not be separately prosecuted or punished under New York law. Friedman, 854 F.2d at 565. Indeed, New York Criminal Procedure Law provisions governing double jeopardy might reasonably have been read to preclude the prosecution of the predicates as two separate offenses in New York. See id. (discussing N.Y.Crim.Proc.Law Secs. 40.10 & 40.20 (McKinney 1981) and N.Y.Penal Law Sec. 70.25(2) (McKinney 1987)). Nevertheless, relying on Paone, we recognized that:
 
 
 63
 New York's rules governing double jeopardy and consecutive sentencing do not affect the generic definition of the crime of bribery. Instead, they are essentially procedural rules governing prosecutions for all crimes in New York. It is not disputed that the bribe[§ were] chargeable and punishable under New York law.... Each was thus a bribe under New York's definition of bribery, even though they both could not be (we assume) separately charged and punished. Because the definition of bribery is unaffected, the two bribes.... remain "chargeable under State law and punishable" for the purposes of RICO and constitute separate predicate crimes.
 
 
 64
 Id. at 566 (citations omitted).
 
 
 65
 In light of Paone and Friedman, we have little difficulty concluding that a state prosecutor's ability to obtain an indictment charging Kelly with Holly's murder is wholly irrelevant to whether the underlying conduct satisfies the "chargeable under State law" definition. Rather, section 1961(1)(A) merely describes the type of generic conduct which will serve as a RICO predicate and satisfy RICO's pattern requirement. Accord United States v. Licavoli, 25 F.2d 1040, 1047 (6th Cir.), cert. denied, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); United States v. Malatesta, 583 F.2d 748, 757-58 (5th Cir.1978), reh'g en banc on other grounds, 590 F.2d 1379, cert. denied, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979); United States v. Frumento, 563 F.2d 1083, 1087 & n. 8A (3d Cir.1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1256, 1258, 55 L.Ed.2d 775, 776 (1978). Here, there is no dispute that the murder of Holly is the type of conduct which is "chargeable under State law" and, therefore, may serve as a RICO predicate act.
 
 
 66
 c. The Six Remaining Predicate Acts
 
 
 67
 Finally, even if we were persuaded by either of Kelly's arguments to dismiss Racketeering Act 16, six other predicate acts would remain, as evidenced by the jury's special verdicts. As a result, there would be no need to overturn the RICO convictions. See United States v. Ruggiero, 726 F.2d at 922-23; see also Brennan v. United States, 867 F.2d 111, 114-16 (2d Cir.), cert. denied, 490 U.S. 1022, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989).
 
 
 68
 3. Kelly's Ability to Challenge Featherstone's Testimony
 
 
 69
 Mickey Featherstone was a critical witness at trial. During both direct and cross-examination, Featherstone testified in great detail about his long history of psychiatric difficulties and admitted that he had once been diagnosed as suffering from paranoid schizophrenia. At no time did defense counsel object to Featherstone's testimony regarding his psychiatric history. Moreover, defense counsel fully availed himself of the opportunity to cross-examine Featherstone. At the close of the trial, Judge Knapp carefully instructed the jury:
 
 
 70
 Featherstone told you of his extensive psychiatric history and that various doctors at various times gave various diagnoses of the nature and extent of his psychiatric difficulties. It must be obvious[ ] to you that a person who has had psychiatric difficulties might give unreliable testimony. It is therefore your obligation to scrutinize such a person's testimony with exceeding care. What impression did he make on you when he was testifying? How, if at all, did his testimony fit in with the testimony of other witnesses about the same events? In brief, you apply the same criteria to a person who has experienced psychiatric difficulties as to any other witness, but you apply them with particular care.
 
 
 71
 Despite all of the foregoing, Kelly argues that his conviction must be reversed because Featherstone's testimony was misleading and the jury was prevented from receiving information from which it could appropriately draw inferences relating to the reliability of Featherstone's testimony. The argument is frivolous.
 
 
 72
 Because Kelly failed to object to the testimony at issue, he cannot now complain that its admission was misleading or otherwise improper. See United States v. Weiss, 930 F.2d at 198-99; United States v. Bilzerian, 926 F.2d 1285, 1294-95 (2d Cir.1991); United States v. Heinemann, 801 F.2d at 96; see also Fed.R.Evid. 103(a)(1). Further, Kelly was provided with ample opportunity to cross-examine Featherstone regarding his mental and emotional problems. Thus, it cannot be said that he was "prohibited from engaging in otherwise appropriate cross-examination designed ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). In addition, we believe that Judge Knapp's instruction thoroughly apprised the jury of the proper method of assessing Featherstone's reliability as a witness.
 
 
 73
 Curiously, Kelly also contends that, even though he made no attempt to call an expert witness, it was error for the district court not to permit an expert to testify on the subject of schizophrenia. In an attempt to justify his critical omission, Kelly submits that it would have been futile to call an expert witness, because in the first Westies trial Judge Knapp refused to permit such an expert to testify. Simply stated, we find no support for the proposition that a defendant, who seeks to introduce expert testimony, is somehow relieved of the obligation of calling an expert witness or making an appropriate offer of proof when the district court has ruled adversely on the particular issue in a different proceeding. Cf. United States v. Musacchia, 900 F.2d 493, 502 (2d Cir.1990) ("we have not established an exception to the contemporaneous objection requirement in areas where there is a 'solid wall of authority' running contrary to the defendant's objection."), cert. denied, --- U.S. ----, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). Moreover, assuming Kelly is correct and that the district court would have ruled the expert's testimony to be inadmissible, it is fairly obvious that such a ruling would not have been an abuse of the court's "broad discretion with respect to the admission of expert testimony." United States v. McBride, 786 F.2d 45, 49 (2d Cir.1986). Judge Knapp certainly would have been justified in finding, as he did in the first Westies trial, that the details of Featherstone's psychiatric history were already fully explored and that the admission of expert psychiatric testimony would have posed a genuine risk of misleading the jury and confusing the issue. See Fed.R.Evid. 403.
 
 4. Challenge to the Sentence
 
 74
 Judge Knapp sentenced Kelly to two consecutive twenty-year terms of imprisonment on the RICO substantive and RICO conspiracy counts, see 18 U.S.C. Sec. 1962(c) & (d), and a consecutive term of ten years of imprisonment for assault in aid of racketeering. See 18 U.S.C. Sec. 1952B. On all other counts, Judge Knapp sentenced Kelly to terms of imprisonment to run concurrently with the sentence already imposed. In total, Kelly received a fifty-year sentence. Kelly complains, as he did in district court, that the sentence imposed on him violates the double jeopardy clause. We disagree.
 
 
 75
 We have previously held that cumulative sentences for violations of RICO subsections 1962(c) and 1962(d) do not violate the Double Jeopardy Clause's prohibition against multiple punishments for the same act. See United States v. Thomas, 757 F.2d 1359, 1370 (2d Cir.), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985); United States v. Bagaric, 706 F.2d at 63-64 n. 18. Similarly, we have concluded that Congress intended "to permit cumulative sentences for a RICO conviction and the predicate offenses upon which the RICO violation is premised." United States v. Walsh, 700 F.2d 846, 856 (2d Cir.), cert. denied, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); see also United States v. Thomas, 757 F.2d at 1370-71 (upholding cumulative sentences for RICO substantive count, RICO conspiracy, and narcotics conspiracy count); cf. Garrett v. United States, 471 U.S. 773, 777-86, 105 S.Ct. 2407, 2410-15, 85 L.Ed.2d 764 (1985) (Congress intended that engaging in a continuting criminal enterprise would be a separate criminal offense which would be punishable in addition to, and not as a substitute for, underlying predicate offenses.). Thus, it was not improper for Judge Knapp to impose a cumulative sentence upon Kelly.
 
 
 76
 Finally, we need not dwell on Kelly's contention that the Supreme Court's recent decision in Grady v. Corbin, --- U.S. ----, 110 S.Ct. 2084, 109 L.Ed.2d 548 undermines our prior holdings on this issue. Although Grady "significantly altered the jurisprudential landscape of double jeopardy," United States v. Gambino, 920 F.2d at 1112, it did so only with respect to the double jeopardy protection against multiple prosecutions and not with respect to the protection against multiple punishments in the same proceeding. Grady, 110 S.Ct. at 2090-93; see also North Carolina v. Pearce, 395 U.S. at 717, 89 S.Ct. at 2076. Consequently, our pre-Grady precedents, upholding cumulative punishments for RICO substantive violations, for RICO conspiracy violations and for the predicate offenses upon which a RICO violation is premised, remain unaltered. See United States v. Maldonado-Rivera, 922 F.2d 934, 981 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991).
 
 CONCLUSION
 
 77
 We have examined each of the defendant-appellant's remaining arguments and find them to be without merit. In light of the foregoing, the judgment of conviction is affirmed.
 
 JON O. NEWMAN, Circuit Judge, concurring:
 
 78
 I concur in Judge Altimari's comprehensive opinion but write separately to illuminate the perplexing issue of whether a federal RICO prosecution may be based on a predicate act for which the defendant has been acquitted in state court. Were I not bound by the precedential force of United States v. Gambino, 920 F.2d 1108 (2d Cir.1990), holding that an offense of which the defendant has been acquitted in federal court may nonetheless serve as a RICO predicate act, I would dissent from the portion of the panel opinion permitting an offense of which the defendant has been acquitted in state court to serve as a RICO predicate act.
 
 
 79
 1. The statutory issue. Judge Altimari reckons with and rejects the statutory argument that conduct--in this case, murder--of which the defendant has been acquitted in state court is not "chargeable" and "punishable" under state law within the meaning of 18 U.S.C. Sec. 1961(1)(A) (1988). As he points out, we have construed this aspect of the definition of predicate act to require only that the alleged act is within the generic conduct identified in section 1961(1)(A), and not that the particular act remains available for state prosecution. See United States v. Friedman, 854 F.2d 535, 565-66 (2d Cir.1988), cert. denied, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); United States v. Paone, 782 F.2d 386, 393-94 (2d Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986). Moreover, as the Government contends, if conduct was not deemed "chargeable" because of a prior acquittal, it would be equally unavailable for use as a predicate act in the event of a prior conviction. Yet there is no room for doubt that Congress intended RICO to provide enhanced federal punishment for RICO offenses, notwithstanding that conduct constituting predicate acts had already resulted in punishment under state law.
 
 
 80
 With deference, however, I do not believe that satisfying the statutory term "chargeable" provides a complete answer to the question of whether Congress intended RICO to be a device for punishing a defendant for an offense of which he had been acquitted. The words of the statute do not focus on this problem at all. The statute does not say that conduct may qualify as a predicate act despite a prior acquittal, nor does it say that reliance on such conduct is prohibited. Of course, it is commonplace to apply statutes with terms of broad application to specific facts not identified in the statute for specific inclusion. But in some circumstances the application of a statute to facts literally within the coverage of its broad terms is so extraordinary that courts may properly construe the statute narrowly to avoid results not likely to have been foreseen or intended by Congress. See Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). Doing so serves the valuable purpose in a representative democracy of obliging Congress to focus its attention on the desirability of the questionable result and extending the statute to the questionable result only if Congress expresses a preference for that result. Of course, it is arguable that democratic values of representative government are equally well served if courts apply the statute to achieve the questionable result and leave to Congress the opportunity to amend the statute to preclude the result in all future cases. That view, however, fails to appreciate the dynamics of the legislative process: it will often be politically impossible to amend a statute to undo a particular result even though that result would not have been authorized had it been expressly voted upon when the statute was initially enacted.
 
 
 81
 Of course, courts must exercise restraint in construing statutes narrowly to precipitate explicit congressional consideration of questionable results. Otherwise, the normal process of enacting statutes of general application would be undermined by an extensive series of restrictive court interpretations, necessitating an equally extensive series of legislative responses. But to recognize the need for caution is not to abandon the inquiry. The issue currently before us is a prime candidate for the type of inquiry I have outlined. Inclusion of conduct for which a person has been acquitted as an element of a crime easily qualifies as an extraordinary result, one that courts should not lightly assume is within the scope of a statute in the absence of some indication by Congress that it wished to go this far. RICO was unquestionably intended to strengthen federal law enforcement, and applying it to secure enhanced penalties notwithstanding prior state convictions for conduct forming elements of the RICO offense fully accords with congressional intent. But there is not a hint in the legislative history that Congress thought that RICO would provide federal prosecutors a second chance to obtain a conviction based on conduct for which a defendant had previously been acquitted.
 
 
 82
 If the issue were open in this Circuit, I would construe RICO to preclude conduct resulting in an acquittal from use as a predicate act. However, the decision in United States v. Gambino, supra, forecloses such a construction. Gambino permitted drug conspiracies of which the defendants had been acquitted to serve as predicate acts for RICO offenses, subject only to the double jeopardy limitation that the RICO offense continue beyond the prior conspiracy. 920 F.2d at 1113.
 
 
 83
 Though Gambino involved a prior federal acquittal, I can see no principled basis for distinguishing, as a matter of statutory construction, between prior federal and prior state acquittals. Though I would not have applied RICO to any prior acquittals in the absence of some legislative indication that such an extraordinary result was intended, I am compelled by the law of this Circuit to accept the panel's construction of the statute.
 
 
 84
 2. The constitutional issue. Judge Altimari rejects the constitutional challenge to using as a RICO predicate act conduct resulting in a state court acquittal on the basis of the well-recognized dual sovereignty principle of double jeopardy jurisprudence. See Heath v. Alabama, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). Though I share the doubts others have expressed about the soundness of this doctrine, see, e.g., United States v. Frumento, 563 F.2d 1083, 1092-96 (3d Cir.1977) (Aldisert, J., dissenting), cert. denied, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), at least in the fullness of its current scope, I agree with Judge Altimari that the doctrine requires rejection of the double jeopardy challenge in this case.
 
 
 85
 It has been forcefully argued that the dual sovereignty principle ought not to apply to use of prior state acquittals as RICO predicate acts, see United States v. Louie, 625 F.Supp. 1327, 1336-37 (S.D.N.Y.1985), appeal dismissed, 787 F.2d 65 (2d Cir.1986); see also United States v. Frumento, 563 F.2d at 1097-98 (Aldisert, J., dissenting). But if the principle is to be refined, that task belongs to the Supreme Court. I accept the view that prevailing double jeopardy doctrine defeats appellant's constitutional challenge. See United States v. Pungitore, 910 F.2d 1084, 1105-06 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); United States v. Malatesta, 583 F.2d 748, 757 (5th Cir.1978), aff'd in pertinent part in banc, 590 F.2d 1379 (5th Cir.), cert. denied, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).
 
 
 86
 For these reasons, I concur in the opinion of the Court.
 
 
 
 *
 Honorable Kenneth Conboy, United States District Court for the Southern District of New York, sitting by designation