ALTIMARI, Circuit Judge:
Defendants-appellants Federico “Fritzy” Giovanelli, Steven Maltese and Carmine Gualtiere appeal from judgments of conviction, entered in the United States District Court for the Southern District of New. York, following a jury trial before Judge Constance Baker Motley.
The defendants’ convictions were the consequence of a prosecution in which the government based federal racketeering charges, see 18 U.S.C. § 1962(c) & (d) (1988), on conduct that had already been the subject of prior state criminal proceedings. Specifically, for the third time, the defendants faced charges that they had murdered a New York City Police Department (“NYPD”) Detective and attempted to murder another NYPD Detective. Here, the charges were in the form of predicate acts of racketeering. On appeal, the defendants contend, among other things, that the trial court’s prohibition against directly mentioning the prior state trials deprived them of the ability to fully cross-examine *482 the witnesses against them and to otherwise defend against the murder and attempted murder allegations. The defendants also challenge the jury’s finding that they had violated the racketeering statute by engaging in the collection of unlawful debt. In addition, the defendants claim that reversal of their convictions is warranted on the ground that the prosecution violated principles of double jeopardy. Finally, the defendants contend that the prosecution engaged in misconduct by playing for the first time during rebuttal summation tape-recordings of telephone conversations which served to undermine the defense’s position on the murder and attempted murder allegations.
As discussed below, we are not persuaded that reversal of the defendants’ convictions is warranted. However, we do believe that the defendants were denied an opportunity to defend properly against the predicate acts of murder and attempted murder. Accordingly, we affirm the judgments of conviction, vacate the jury’s findings on the murder and attempted murder predicate acts of racketeering, and remand to the district court for resentencing.
BACKGROUND
1. The Shooting Of Anthony Venditti And Kathleen Burke
In late 1985 and early 1986, NYPD Detectives Anthony Venditti and Kathleen Burke were engaged in the investigation of suspected members and associates of the Genovese Organized Crime Family. Included among those under investigation were defendants-appellants Federico Giova-nelli, Steven Maltese and Carmine Gualti-ere.
On the evening of January 21, 1986, Ven-ditti and Burke were conducting surveillance of a social club located in the Ridge-wood section of Queens. At approximately 8:00 p.m., they decided to discontinue surveillance. Venditti told Burke, who was driving, that he needed to use the men’s room located in the nearby Castillo Diner. At Venditti’s request, Burke drove to the restaurant and dropped him off.
While Venditti went into the restaurant, Burke drove around the block once and parked their unmarked police car, a brown Lincoln Town Car, across the street from the Diner. After exiting the vehicle, Burke walked towards the Diner and began to ascend one of two staircases leading to its entrance. Having taken the first few steps, Burke noticed that Venditti was in the midst of descending the other staircase. Burke therefore alighted the staircase and began walking in the direction of the second staircase. As Burke did so, her view of Venditti was briefly obstructed. When she again caught sight of him, Venditti was flanked by three men — one on each side and one directly in front of him. Believing the men to be the individuals they had been investigating, Burke called out a warning. The man in front of Venditti immediately turned toward Burke and fired one shot from a gun, striking her in the chest. Simultaneously, Burke removed a revolver from her jacket pocket and, as she fell to the ground, fired five shots at her assailant. The assailant then walked towards Burke and fired a second shot that missed; he then turned and fired at Venditti. At this time, Burke observed that the other two men were also shooting at Venditti. She watched as Venditti’s body made a strange jerking motion and fell to the ground. Shortly thereafter, Burke lost consciousness.
Detective Burke was eventually taken to nearby Wyckoff Heights Hospital, where it was determined that a bullet had entered her body through the left chest area, broken two ribs, punctured her left lung, and broken her scapula, before exiting through her back. Burke received emergency medical treatment that included the insertion of a chest tube in order to drain her thoracic cavity. While being treated, Burke was interviewed by NYPD Detective Anton Olsen. Burke provided a detailed account of the events leading up to the shooting and identified “Fritzy,” that is, Federico Giova-nelli, as her assailant. Although she described the two other individuals involved in the shooting, Burke failed to identify them by name. In subsequent interviews, however, she insisted that the other men *483 were Steven Maltese and Carmine Gualti-ere.
Despite suffering various ailments as a consequence of the shooting, Burke ultimately was able to return to duty as a NYPD Detective. Detective Venditti, who was struck by a total of four bullets, died on the night of January 21.
2. The State Prosecution
As a consequence of the foregoing, the State of New York obtained an indictment charging Giovanelli, Maltese and Gualtiere with the murder of Detective Anthony Ven-ditti and the attempted murder of Detective Kathleen Burke. The charges resulted in two trials in New York State Supreme Court, Queens County. At the conclusion of the first trial, all three defendants were acquitted of the attempted murder of Detective Burke. The jury, however, was unable to reach a verdict regarding the murder of Detective Venditti and a mistrial was declared with respect to that charge.
All three defendants were re-tried on the murder charge. During summation in the second trial, Frank Simone — an eyewitness who testified at the two state trials and implicated both Giovanelli and Gualtiere— came forward and declared that he had given untruthful testimony. As a result, Simone was permitted to retake the stand and recant portions of his prior testimony. Specifically, Simone claimed that under pressure from the police he had falsely testified that he had seen Gualtiere at the scene of the murder. At the end of the second trial, the jury acquitted Gualtiere but, once again, was unable to reach a verdict with respect to Giovanelli and Maltese. No further state prosecution followed.
3. The Federal Prosecution
On February 28, 1989, a seven-count federal indictment was filed, charging Giova-nelli, Maltese and Gualtiere with various offenses arising from their alleged participation in a racketeering enterprise. The principal counts of the indictment charged all three defendants with participating in, and conspiring to participate in, the enterprise’s affairs through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1962(c) & (d). The pattern of racketeering activity allegedly consisted of: (i) the conduct of an illegal gambling business and/or the transmission of illegal wagering information; (ii) . a loansharking conspiracy; (iii) the murder of Detective Venditti; (iv) the attempted murder of Detective Burke; (v) interstate travel in aid of the racketeering enterprise; and (vi) the 1976 murder of Charles Benti-vegna. Alternatively, the indictment charged the defendants with participating in, and conspiring to participate in, the enterprise’s affairs through the collection of unlawful debt, in violation of 18 U.S.C. §§ 1962(c) & (d). The collections of unlawful debt were alleged to have involved money owed by John Marsala, Barbara Messina Kranz and Larry Alfano. The defendants were also charged with various offenses which corresponded to the RICO predicate acts.
An eleven-week jury trial was held before Judge Constance Baker Motley. On the first day of trial, the district judge ruled that no direct reference was to be made to the prior state trials. Instead, the state trials were to be referred to as “proceedings.” Apparently, Judge Motley was concerned that the government’s case would be prejudiced if the jury knew of the outcome of the prior trials or even if the jury knew of the fact that there were prior trials. On several occasions, the district judge found it necessary to warn defense counsel that they were not complying with this ruling. Further, early in the trial, Gualtiere’s defense counsel was held in contempt of court for failing to adhere to the ruling. The court subsequently rescinded this contempt order.[1]
*484 During the course of the trial, the prosecution called sixty witnesses, including the defendants' former associates, alleged victims of the defendants’ criminal enterprise, and several law enforcement agents who had participated in the investigation leading to the defendants’ indictment. Numerous tape-recordings of the defendants and other individuals, made pursuant to a court-ordered wiretap on Giovanelli’s home telephone, were introduced and/or played at trial. The jury also heard two conversations that had been tape recorded by a cellmate incarcerated with Maltese in the Bronx House of Detention. During the conversations, Maltese admitted that he operated a gambling business that was affiliated with organized crime.
The evidence adduced by the government essentially demonstrated the following facts. The defendants’ racketeering enterprise, which functioned as an arm of the Genovese Organized Crime Family, was headed by Giovanelli, who was a Genovese Family “soldier” or “made member.” As a Genovese soldier, Giovanelli was required to pay a percentage of his enterprise’s profits to the Genovese operation. Maltese was Giovanelli’s partner in both the loansharking and gambling businesses. With respect to the gambling business, Maltese was responsible for supervising the operation and conveying Giovanelli’s directives to subordinates. Gualtiere was the chief controller of the gambling operation and received a salary as well as a percentage of the profits.
The defendants’ gambling business predominantly consisted of numbers, sports and horse betting. The operation employed more than 100 runners, sheet writers, pickup men and controllers. The main office of the business was located at 41 Highland Place in Brooklyn — the home of Giovanel-li’s mother. A 1982 search of 41 Highland Place yielded five boxes filled with gambling records and a variety of gambling paraphernalia. Keeran “Butch” Sullivan, a fifteen-year employee of the enterprise, identified many of the seized gambling records and described their function. The records, among other things, reflected numerous gambling transactions involving John Marsala, Larry Alfano and Barbara Messina Kranz, each of whom placed bets with the gambling operation through Sullivan. Moreover, Sullivan described how he would take bets over the telephone from various people, including Marsala, Alfano and Kranz, and would collect what was owing from the bettors at the end of each week. According to Sullivan, the proceeds were turned over to the defendants. An expert witness’ analysis of the seized records, which accounted for only six months worth of numbers betting, reflected a gross income in excess of $5,600,-000 and a net profit of $790,000.
Giovanelli and Maltese, as mentioned above, were also partners in the enterprise’s loansharking business. Generally, Giovanelli, Maltese or their subordinates would loan money at usurious rates of interest and assure repayment through intimidation and, at times, violence. For example, Richard Waters testified that throughout the 1970s he took approximately ten loans from the defendants of between $5,000 and $10,000 in order to meet payrolls in his construction business. The interest on the loans varied from one-half percent to three percent per week and payments were made directly to Giovanelli and Maltese. At one point, when Waters fell behind in payment, Giovanelli “threw a punch” at him and demanded to be paid. On another occasion, at the funeral of Waters’ daughter, Maltese confronted Waters and asked him about the approximately $20,000 he owed.
Similarly, Giovanelli and Maltese loaned money to Raymond Losito, a supposed gambler who placed numerous bets through Maltese. Losito claimed that he wanted to borrow $3,000 to loan to his gambling customers at usurious rates of interest. Giovanelli approved the loan, and Losito subsequently made weekly interest payments to Giovanelli, Maltese and Butch Sullivan. Unbeknownst to the defendants, Losito was actually an undercover NYPD Detective. In 1979, Giovanelli and Maltese *485 pleaded guilty in state court to conspiring to make a usurious loan to Losito.
The government also attempted to demonstrate that Giovanelli, Maltese and Gual-tiere were responsible for the murder of Detective Venditti and the attempted murder of Detective Burke. As in state court, Burke once again testified that on the night of January 21, 1986, Giovanelli fired two shots at her — one that hit her in the chest and another that missed her — and then fired on Venditti. Burke further stated that Maltese and Gualtiere had also fired at Venditti. As a result of this gun fire, Burke saw Venditti’s body jerk strangely and fall to the ground. The prosecution also presented an array of circumstantial evidence connecting the defendants to the shooting.
Additionally, the government offered proof to show that the defendants shot Detectives Venditti and Burke to protect their enterprise, i.e., that the shooting was part of the defendants’ pattern of racketeering activity. To this end, Butch Sullivan and John Cataraso, both former employees of the defendants, testified that several weeks before the shooting, one of the defendants’ gambling locations had been robbed. Shortly thereafter, the defendants noticed that a brown Lincoln Town Car had been following several individuals associated with the gambling business. According to Sullivan, because the defendants were concerned about the possibility of being robbed again, they attempted to ascertain the identity of the car’s occupants. In particular, Maltese asked his cousin-by-marriage, a NYPD Detective, to trace the brown Lincoln’s licence plate. Giovanelli also attempted to have the plate traced through an associate’s contact “in the traffic department.” Thus, the government argued that the defendants — unaware of the true identity of their victims — shot Venditti and Burke to protect their gambling business from a possible robbery.
The defense called forty-three witnesses, including several law enforcement officials. The defendants did not seriously contest the gambling allegations but vehemently disputed any responsibility for the murder of Venditti and the attempted murder of Burke. Giovanelli and Maltese contended that on the night in question two unknown men attempted to rob Giovanelli, that Ven-ditti and Burke, who had been surveilling Giovanelli, appeared on the scene and interrupted the robbery, and that shots were exchanged between the robbers and the detectives resulting in the killing of Vendit-ti and the wounding of Burke. Gualtiere claimed that he was not present at the scene of the shootings and therefore had no knowledge of the events at issue.
The defense case focused on, among other things, inconsistencies in statements and testimony provided by government witnesses. In particular, the defendants stressed that during an interview at the Wyckoff Heights Hospital, immediately following her shooting, Detective Burke had failed to identify by name Maltese and Gualtiere. The defendants further argued that Detective Burke had rehearsed her testimony on dozens of occasions and that her pivotal testimony implicating the defendants had been modified and refined over the course of the several proceedings. The defendants also asserted that the criteria that the police used to develop a list of suspects was inconsistent with an eyewitness description of the gunmen. In addition, the defendants demonstrated that witness Frank Simone had previously recanted portions of testimony, given at a prior proceeding, i.e., the first state trial, which had incriminated Giovanelli and Gualtiere. According to Simone, his prior fallacious testimony was obtained as a result of pressure from the police. The defendants also attempted to undermine the credibility of two important government witnesses by questioning them on the reasons for their failure to come forward with damaging evidence in earlier proceedings.
After five days of deliberation, the jury found Giovanelli, Maltese and Gualtiere guilty of the charged RICO violations. See 18 U.S.C. §§ 1962(c) & (d). Specifically, the jury found that Giovanelli had engaged in four predicate acts of racketeering: conducting an illegal gambling business; conspiring to loanshark; murdering Detective *486 Venditti; and, attempting to murder Detective Burke. Maltese was found to have committed the same four predicate acts of racketeering, plus one additional act, interstate travel in aid of the racketeering enterprise. However, the jury rejected the predicate act of racketeering based on the charge that Giovanelli and Maltese had murdered Charles Bentivegna. With respect to Gualtiere, the jury found in a special verdict that he had committed three predicate acts of racketeering: conducting an illegal gambling business; murdering Detective Venditti; and attempting to murder Detective Burke. Alternatively, the RICO convictions were supported by the jury’s finding that each defendant had engaged in the collection of unlawful debt.
On the remaining counts, Giovanelli, Maltese and Gualtiere were each convicted of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955 (1988), and conspiring to defraud the United States by impeding the Internal Revenue Service (“IRS”) in the ascertainment and collection of taxes, in violation of 18 U.S.C. § 371 (1988). Giovanelli and Maltese were also convicted of conspiring to loanshark, in violation of 18 U.S.C. § 892 (1988), and Maltese was convicted of using facilities of interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952 (1988) (“Travel Act”).
The defendants were sentenced to twenty year terms of imprisonment on each of the two RICO counts, and five year terms of imprisonment for conducting a gambling business and impeding the IRS. Giovanelli was sentenced to an additional five year term of imprisonment and Maltese was sentenced to an additional seven year term as a result of their loansharking convictions. In addition, Maltese received a five year term of imprisonment for his conviction on the Travel Act charge. The sentences were to run concurrently. Thus, each defendant received a total prison sentence of twenty years. Giovanelli was fined $25,-000, i.e., $5,000 per count of conviction, and each defendant was assessed $50 on each count of conviction.
DISCUSSION
Although the defendants advance a myriad of arguments on this appeal, our primary focus is whether the defendants’ rights were violated by the district judge’s ruling precluding direct reference to the prior state trials. We also examine whether the defendants’ RICO convictions can be affirmed based on the collection-of-unlawful-debt theory. In addition, although not necessary for the disposition of this appeal, we address defendants’ claim that the use of the Venditti murder and Burke attempted murder as predicate acts of racketeering violated principles of double jeopardy. Finally, we consider defendants’ contention that the prosecution engaged in misconduct by playing various tape recorded conversations during rebuttal summation.
1. Ruling Precluding Reference to Prior State Trials
As detailed above, all three defendants were previously acquitted of the attempted murder of Kathleen Burke, Gualtiere was acquitted of the murder of Anthony Vendit-ti, and two juries were unable to reach a verdict with respect to the charge that Giovanelli and Maltese had murdered Ven-ditti. Nevertheless, in the present case, the defendants were each charged with two predicate acts of racketeering based on the murder of Venditti and the attempted murder of Burke. Before the commencement of the trial, the district court ruled that counsel were not permitted to refer directly to those prior state trials. On this appeal, as in district court, the defendants argue that the court’s ruling deprived them of an opportunity to fully and fairly cross-examine the witnesses against them. The defendants also contend that throughout the trial, the district judge increasingly expanded the scope of this ruling, making it virtually impossible to mount an adequate defense while at the same time complying with the court’s prohibition.
As an initial matter, we fully appreciate the unusual difficulties presented when a district judge must preside over a case in which a defendant has been previously tried. In particular, the judge- must *487 reckon with claims that witnesses are deliberately or subliminally refining their testimony in light of the prior trial. At the same time, the judge must be mindful that revealing the verdict of the prior trial may unfairly prejudice either the government’s or the defendant’s case. Thus, in certain instances, it may well be appropriate to balance these competing concerns by initially precluding all references to the prior trial. See, e.g., United States v. Jones, 808 F.2d 561, 566 (7th Cir.1986), cert. denied, 481 U.S. 1006, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987). As the trial unfolds, however, it is essential that the court provide counsel with sufficient latitude “to expose to the jury the facts from which the jurors, as the sole triers of fact and credibility, [can] appropriately draw inferences relating to the reliability of the witnesses].” Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). In other words, the dynamics of a particular trial may require the trial judge to reverse or curtail a ruling that initially precluded all references to a prior trial.
With these precepts in mind, we turn to consideration of the district court’s initial ruling and its various permutations at trial.
A. The Trial Court’s Rulings
At the outset of the trial, the court instructed
[T]here is to be no reference directly to the fact that there were prior trials. If during the course of trial you have occasion to eross[-]examine a witness who also testified at the prior trial, you can refer to a prior proceeding: Did you testify at a prior proceeding? But there is to be no reference to the fact that there were prior trials here.
This ruling was subsequently and repeatedly expanded.
For instance, on the morning that cross-examination of a critical government witness, Butch Sullivan, was to begin, the prosecutor requested that the court instruct the defense “not to ask any questions which would create the impression that there was a prior trial.” Although the judge stated that there was no reason to alter her ruling, in actuality the ruling was expanded when she instructed defense counsel that “grand jury proceedings, prior trials, and all testimony in this case” must be referred to “as a prior proceeding.” Later the same day, the ruling was again expanded when defense counsel attempted to elicit testimony from Sullivan regarding his prior interview by Queens Assistant District Attorneys. When the prosecutor objected, the court ruled, “Don’t refer to any Queens matter.”
The following day, with Sullivan still on cross-examination, the prosecution complained that defense counsel were improperly stressing the dates of the prior proceedings and the District Attorney’s Office involvement in those proceedings. Accordingly, the judge stated: “The defense attorneys are instructed not to refer to prosecutors, not to name the prosecutors, not to refer to buildings. The only proper use for these prior statements is for impeachment purposes_ You refer to prior proceedings, and that’s all.”
Shortly thereafter, in response to another series of prosecution objections, counsel explained that he was merely attempting to show the jury that, with the passage of time, Sullivan had subtly altered his version of events. According to counsel, the court’s ruling made it extremely difficult to focus Sullivan’s attention on any one of his numerous prior statements and thus to demonstrate the inconsistencies in his testimony. The court apparently refused to alter its ground rules. Indeed, in response to yet another prosecution objection to the cross-examination of Sullivan, the judge admonished counsel:
the only time you can refer to ... a prior proceeding in this case is when you are trying to impeach the witness, but you repeatedly refer to prior proceedings over and over and over again, and that is to try to impress upon the jury that there were prior trials. ...
And, moments later, the court ruled: “when you are talking about a prior proceeding you don’t use the date. If you are trying to show a progression in his disclo *488 sures, you can use the date without saying proceeding, do you follow that?”
Similar restrictions plagued defense counsels’ attempts to cross-examine other witnesses. In particular, the court’s ruling created obvious difficulties when cross-examining Kathleen Burke, who not only testified at the state trials but admittedly altered her testimony after the first trial. Further, although the defendants were able to demonstrate that two government witnesses, one of whom was a police officer, had failed to come forward to testify at certain proceedings, they were not permitted to bring out the fact that those “proceedings” were in fact trials.
B. Were the Rulings an Abuse of Discretion?
Although hindsight is a luxury reserved for appellate judges, we firmly believe that at the outset of trial it was readily apparent that a preclusion of all references to prior trials would present insurmountable obstacles for the defense. The trial judge should have been aware that many of the critical witnesses who would be called to testify had previously appeared at two state court trials and at least two grand jury proceedings. These witnesses had been subjected to numerous investigative interviews and their statements appeared in a multitude of police reports made in the ordinary course of police business. Thus, it was apparent that the defense counsel would attempt to impeach the witnesses through the use of trial transcripts, grand jury minutes and other documents. Here, the defendants could not have been expected to test “the believability of a witness and the truth of his [or her] testimony,” Davis, 415 U.S. at 316, 94 S.Ct. at 1110, when it was at times impossible to focus a witness’ attention on a specific prior inconsistent statement.
Moreover, from the very first day of trial, it was patently clear that the crux of the defense to the alleged predicate acts of murder and attempted murder would be that key government witnesses — especially Kathleen Burke and Butch Sullivan — had subtly refined their testimony at the various trials and proceedings. As a result, the ability to confront witnesses with their own prior statements, and to show that those statements had been made in a setting as solemn and dignified as the current trial, was of extreme importance to the defense. We believe that the defendants were entitled to demonstrate that Kathleen Burke and Butch Sullivan had not merely altered or subtly refined their testimony after “prior proceedings” but had done so after prior trials. We also believe that the defendants should have been permitted to advance the theory that two government witnesses had not simply refused to come forward during “prior proceedings” but had failed to do so during two prior trials. While the government suggests that the distinction between “trial” and “proceeding” is minimal, surely in the context of this case there was a meaningful — if not profound — difference between the two. Indeed, the use of the word “proceeding” obfuscated the precise point the defendants wished to impress upon the jury, i.e., that these very witnesses had previously testified under oath in a trial before a jury and had done so in a manner subtly at odds with their present testimony. Regardless of whether the district judge found this argument persuasive, the defendants were entitled “ ‘to put before [the] jury evidence that might influence the determination of guilt.’ ” United States v. Salerno, 937 F.2d 797, 810 (2d Cir.1991) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56, 107 S.Ct. 989, 1000, 94 L.Ed.2d 40 (1987)). The unfair effect of the limitation of cross-examination becomes evident upon an examination of the entire trial transcript. Accordingly, we are convinced that the district court’s initial ruling, and its subsequent expansions of that ruling, constituted a clear abuse of discretion. See United States v. Bari, 750 F.2d 1169, 1178 (2d Cir.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); see also United States v. Maldonado-Rivera, 922 F.2d 934, 956 (2d Cir.1990), cert. denied, — U.S. —, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991).
Additionally, it bears noting that a simple solution existed to the dilemma con *489 fronting the district judge. We believe the prudent course would have been for the judge to have simply explained to the jurors that under the doctrine of dual sovereignty it is permissible for the Federal government to prosecute an individual for the same offense that has previously been the subject of prosecution by the State. See Heath v. Alabama, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); United States v. Coonan, 938 F.2d 1553, 1562-63 (2d Cir.1991) (decided after defendants’ trial); United States v. Davis, 906 F.2d 829, 832 (2d Cir.1990) (same). The judge could then have: (1) revealed that during the trial the jury would hear references made to testimony given at prior state trials, (2) instructed the jurors not to speculate about the outcome of the prior trials, and (3) permitted counsel to refer to the trials but not to their outcome. Experience has shown that jurors readily accept and obey such instructions. By failing to place sufficient faith in the jury, the district judge increased the confusion inherent in this already complicated case.
Since the contempt determinations have been dealt with by this Court on a prior appeal, see United States v. Giovanelli, 897 F.2d 1227, there is no need to revisit them. It is sufficient to say that had the defense counsel adhered to the court’s initial ruling, our task today would have been less difficult. In fact, in a variety of instances the problems engendered by the court’s ruling were greatly exacerbated by defense counsels’ refusal to heed the district judge’s instruction and proceed with the trial. Nevertheless, even if defense counsel had not engaged in periodic obstreperousness, the result today would be the same.
C. Effect of the Error
Although we believe the court’s error was prejudicial, we do not believe that it warrants reversal of defendants’ convictions. By refusing to allow any direct reference to the prior trials, the district court essentially 'undermined the defendants’ ability to mount a defense to the specific charges that they murdered Detective Ven-ditti and attempted to murder Detective Burke. The court’s ruling, however, did not affect in any meaningful way the remainder of the trial. The defendants were permitted to and did vigorously cross-examine the prosecution witnesses on all other relevant subject matters, including all other predicate acts. Further, we are convinced that no “spillover taint” infected the trial. See United States v. Salerno, 937 F.2d at 808-09. Finally, there simply is no meaningful evidence of judicial bias or misconduct that would necessitate reversal of an otherwise valid conviction. See United States v. Mickens, 926 F.2d 1323, 1327 (2d Cir.1991); United States v. Bejasa, 904 F.2d 137, 141 (2d Cir.), cert. denied, — U.S. —, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990); United States v. Robinson, 635 F.2d 981, 984-86 (2d Cir.1980), cert. denied, 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). Accordingly, the proper remedy in this case is to vacate the jury’s finding solely with respect to the predicate acts of racketeering based on the murder of Ven-ditti and the attempted murder of Burke.
Having concluded that it is necessary to vacate the jury’s finding with respect to two of the predicate acts of racketeering, we must consider the impact of this conclusion on the defendants’ substantive and conspiracy RICO convictions. Since the district court employed a special verdict form, this is a relatively simple task. Review of the verdict form reveals that the jury found — apart from the murder and attempted murder predicates — that Giova-nelli had committed two acts of racketeering (conducting an illegal gambling business and conspiring to loanshark) and that Maltese had committed three acts of racketeering (conducting an illegal gambling business, conspiring to loanshark and violating the Travel Act). It is therefore readily apparent that an adequate basis exists to affirm their convictions. See United States v. Coonan, 938 F.2d at 1564. See generally United States v. Ruggiero, 726 F.2d 913, 925-28 (2d Cir.) (Newman, J., concurring in relevant part), cert. denied, *490 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).
In contrast, Gualtiere’s convictions present a more difficult question. Without the murder and attempted murder predicates, Gualtiere was found to have committed only one predicate act of racketeering (conducting an illegal gambling business). Thus, were the only basis for Gualtiere’s RICO convictions the jury’s finding that he had participated in the “enterprise” through a pattern of racketeering activity, it would be necessary to reverse. However, the jury also based its RICO verdict on an alternative theory of liability. Specifically, the jury found that Gualtiere, as well as his two co-defendants, had participated in the “enterprise” through the collection of unlawful debt. Accordingly, it is necessary to consider whether the unlawful debt collection theory provides a valid basis to affirm Gualtiere’s convictions.
2. Collection of Unlawful Debt
Criminal liability under RICO can be established by proving, inter alia, that the accused “participate^], directly or indirectly, in the conduct of [a racketeering] enterprise’s affairs through ... collection of unlawful debt.” See 18 U.S.C. § 1962(c). RICO defines “unlawful debt” to mean:
a debt (A) incurred or contracted in gambling activity which was in violation of the law ... or which is unenforceable under State or Federal law ... because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law ..., or the business of lending money or a thing of value at a rate usurious under State or Federal law....
18 U.S.C. § 1961(6) (1988). Unlike a “pattern of racketeering activity” which requires proof of two or more predicate acts, to satisfy RICO’s “collection of unlawful debt” definition the government need only demonstrate a single collection. See United States v. Vastola, 899 F.2d 211, 228 n. 21 (3d Cir.), vacated and remanded on other grounds, — U.S. —, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); United States v. Pepe, 747 F.2d 632, 645 (11th Cir.1984). Compare 18 U.S.C. § 1961(5) with 18 U.S.C. § 1961(6). Here, the jury found that the defendants had engaged in the collection of unlawful debt from three individuals: John Marsala, Barbara Messi-na Kranz, and Larry Alfano.
The defendants challenge the jury’s finding on two grounds. First, they correctly note that Marsala, Kranz and Alfano were employed as “runners” in the gambling operation. .Based on this fact, the defendants contend that the collections at issue amount to no more than the intraorganization transfer of funds. Obviously, the transmission of money within an organization, regardless of that organization’s legality, does not constitute collection of a debt. Indeed, if Marsala, Kranz and Alfano were only runners, we would have no difficulty rejecting the jury’s finding. However, reviewing the evidence “in the light most favorable to the government, and construing all permissible inferences in its favor,” United States v. Puzzo, 928 F.2d 1356, 1357 (2d Cir.1991), we are satisfied that the jury was entitled to find that, although employed as runners, Kranz and Alfano personally placed wagers with the defendants’ gambling business and that the resulting debts were collected by the defendants. While the evidence adduced fails to demonstrate that Marsala placed personal bets with the defendants, as noted above, the government need only demonstrate a single “collection of unlawful debt.” Accordingly, the jury’s verdict must be allowed to stand. See United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir.1989), cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).
Second, the defendants argue that the jury’s finding must be rejected because the collection of money due on a losing wager does not satisfy RICO’s definition of “unlawful debt.” They assert that to satisfy the definition the prosecution must demonstrate that “loans [were extended] to cover gambling losses in order to facilitate continued wagering” or that the collection was akin to a “visit by a mob strongarm to enforce an illegal gambling debt.” The *491 validity of this assertion is belied by the plain language of the statute.
Section 1961(6), as the government points out, defines two separate categories of unlawful debts: one involving gambling activity and the other involving loansharking activity. The type of debt the defendants claim will satisfy section 1961(6)’s definition clearly falls within the “loansharking” category. It is equally clear, however, that a garden variety debt—i.e., “[a] specified sumí of money owing to one person from another,” Black’s Law Dictionary 363 (5th ed. 1979)—accumulated as the result of illegal betting, falls within the “gambling activity” category. See United States v. Angiulo, 847 F.2d 956, 968 (1st Cir.), cert. denied, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988). Thus, there can be no doubt that RICO’s definition of unlawful debt includes the type of obligations incurred by Kranz and Alfano when they placed wagers with the defendants’ gambling business.
In sum, we are satisfied that the defendants were properly found to have violated RICO by virtue of their collection of unlawful debt. Consequently, regardless of our finding with respect to the pattern of racketeering activity, Gualtiere’s and his co-defendants’ RICO convictions are affirmed on this basis.
3. Double Jeopardy
In light of the foregoing, it is not necessary for the disposition of this appeal that we reach the defendants’ claim that the use of previously prosecuted conduct as predicate acts of racketeering in a subsequent RICO prosecution violates principles of double jeopardy. In a series of post-argument submissions, however, the defendants have repeatedly pressed this issue upon the Court. For the most part, the assertions contained in those submissions are based on a fundamental misreading of our recent decisions in United States v. Gambino, 920 F.2d 1108, 1112-13 (2d Cir.1990), and United States v. Coonan, 938 F.2d at 1562-63. We are concerned that the defendants’ flawed analysis is likely to recur and to be repeated by other defense counsel. In order to clarify this matter, we briefly consider the double jeopardy issue.
The double jeopardy clause of the Fifth Amendment states that no person shall “be subject for the same offence to be twice put in jeopardy of life or limb.” U.S. Const, amend. V. It is well-settled that the double jeopardy clause “protects against a second prosecution for the same offense after acquittal.” North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnote omitted); see also Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 2091, 109 L.Ed.2d 548 (1990). It is equally well-established, however, that the double jeopardy clause’s protection only applies in instances where the same sovereign is responsible for the successive prosecutions. See United States v. Coonan, 938 F.2d at 1562-63; United States v. Davis, 906 F.2d at 832. Thus, in the present case the defendants’ reliance on the double jeopardy clause is misplaced.
As we previously explained:
One of the by-products of our nation’s federal system is the doctrine of “dual sovereignty.” ... This doctrine rests upon the basic structure of our polity. The states and the national government are distinct political communities, drawing their separate sovereign power from different sources, each from the organic law that established it. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses. When a single act violates the laws of two sovereigns, the wrongdoer has committed two distinct offenses.
United States v. Davis, 906 F.2d at 832. Indeed, in United States v. Coonan, addressing an issue virtually indistinguishable from the present one, we stated that “a state prosecution does not bar a subsequent federal prosecution of the same person for the same act.” Coonan, 938 F.2d at 1562 (citing United States v. Wheeler, 435 U.S. 313, 316-17, 98 S.Ct. 1079, 1082-83, 55 L.Ed.2d 303 (1978) and Abbate, 359 U.S. at 194-95, 79 S.Ct. at 670-71). Thus, the fact that Giovanelli, Maltese and Gualti- *492 ere were prosecuted in state court for the murder of Venditti and attempted murder of Burke “did not preclude the federal authorities from charging [the] very same offense[s] as [ ] predicate act[s] in the subsequent RICO action.” Coonan, 938 F.2d at 1563; accord United States v. Farmer, 924 F.2d 647, 649-50 (7th Cir.1991); United States v. Pungitore, 910 F.2d 1084, 1105-06 (3d Cir.1990), cert. denied, — U.S. -, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991).
Nevertheless, citing a recent series of Second Circuit cases, the defendants assert that a RICO conviction cannot be based on conduct previously charged in a state prosecution unless the government demonstrates that racketeering activity continued after the initial prosecution. See, e.g., United States v. Gambino, 920 F.2d at 1112; United States v. Scarpa, 913 F.2d 993, 1013-14 n. 8 (2d Cir.1990). Accordingly, the defendants argue that, since the government failed to prove that racketeering activity occurred after their state trials, it was improper to base their RICO indictment on the murder of Venditti and attempted murder of Burke. The defendants’ argument is based on a faulty analysis of the case law.
As the defendants note, this Court has recently had occasion to consider whether previously prosecuted conduct might be charged as a RICO predicate act without violating the double jeopardy clause. See, e.g., Gambino, 920 F.2d at 1112-13; Scarpa, 913 F.2d at 1013-14 n. 8; United States v. Persico, 832 F.2d 705, 711 (2d Cir.1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). Each of the cases cited by the defendants, however, actually concerned an even more precise issue, i.e., whether the use of conduct that was the subject of a prior federal prosecution might be charged as a predicate act in a subsequent federal RICO prosecution without violating the double jeopardy clause. Since the dual sovereignty doctrine obviously does not apply in such situations, it was necessary for us to ascertain whether some other theory existed under which the prosecution could be maintained without violating principles of double jeopardy. Consequently, we considered whether the traditional double jeopardy analysis was in any way altered by RICO’s “compound-complex” nature.
Our inquiry began with a recognition that “double jeopardy principles developed in the ‘classically simple situation presented in’ single transaction cases [cannot] be readily transposed to the ‘multilayered conduct, both as to time and to place involved’ in [a] ... RICO case[ ].” Gambino, 920 F.2d at 1113 (quoting Garrett v. United States, 471 U.S. 773, 789, 105 S.Ct. 2407, 2416, 85 L.Ed.2d 764 (1985)). Further, we noted that oftentimes the government is not in a position to charge a RICO violation until after the individual predicate acts have been prosecuted. See Gambino, 920 F.2d at 1113 (citing Garrett, 471 U.S. at 788-89, 105 S.Ct. at 2416-17). Based on these considerations, we ultimately held that the double jeopardy clause does not bar the use of conduct that was the subject of a prior prosecution, as a predicate act of racketeering in a subsequent RICO prosecution, brought by the same sovereign — at least when the racketeering activity continues beyond the initial prosecution. See Gambino, 920 F.2d at 1113; Scarpa, 913 F.2d at 1013-14 n. 8; Persico, 832 F.2d at 711; see also Coonan, 938 F.2d at 1563.
Of course, that holding, addressed as it was to successive prosecutions by the same sovereign, is of minimal significance in the present case. As explained above, under the dual sovereignty doctrine a federal indictment charging conduct that was previously the subject of a state prosecution simply does not implicate the double jeopardy clause. “[N]othing prevents a federal prosecution whenever the state proceeding has not adequately protected the federal interest.” United States v. Davis, 906 F.2d at 832. Hence, the defendants are in error when they assert that, since the government failed to establish that they engaged in racketeering activity after the conclusion of the state trials, their convictions violate the Fifth Amendment’s double jeopardy clause. Indeed, acceptance of the defendants’ argument would result in an evisceration of the dual sovereignty doctrine.
*493 4. Playing Tape on Rebuttal Summation
Next, the defendants assert that the prosecution engaged in misconduct when, on rebuttal summation, it played a portion of a tape-recording of two telephone conversations between Giovanelli’s wife and Gualtiere’s wife. The conversations occurred shortly after the shooting of Detectives Yenditti and Burke and concerned, among other things, Gualtiere’s whereabouts on the night of the shooting. Based on the conversations, the prosecution essentially argued to the jury that the defendants had manufactured alibis. On appeal, the defendants claim that the prosecutor acted improperly because the recorded conversations had not previously been played for the jury—although the tapes had been entered into evidence. Also, assuming ar-guendo that it was permissible to play the tapes, the defendants contend that it was error for the district judge not to allow the jury to hear the relevant conversations in their entirety.
At most, the defendants’ arguments suggest that their ability to defend against the charges that they murdered Detective Ven-ditti and attempted to murder Detective Burke was undermined by the prosecution’s conduct. Because we have already concluded that it is necessary to vacate the jury’s finding with respect to the murder and attempted murder predicate acts, there simply is no need to consider this issue.
5. The Necessity for a Remand
Finally, this case presents a somewhat unusual situation. As the preceding discussion indicates, we believe that the defendants’ convictions should be affirmed. Under ordinary circumstances, we would simply affirm the lower court’s judgment and there would be no need for a remand. This case, however, is not ordinary.
Specifically, in the present case, it is necessary to vacate the jury’s findings with respect to the murder of Detective Yenditti and attempted murder of Detective Burke. Our reading of the entire record reveals that proof directed at establishing those predicate acts consumed a substantial portion of the trial. Moreover, the murder and attempted murder predicate acts were by far the most grievous charges the jury found to have been proven against the defendants. In holding that the predicate acts must be vacated, we therefore significantly alter the nature of the charges of which the defendants have been convicted. Thus, we believe the appropriate course of action is to vacate the sentence on the RICO counts and to remand the case for resentencing consistent with this opinion.
CONCLUSION
We have reviewed each of the defendants-appellants’ remaining arguments and find them to be without merit. In light of the foregoing, the defendants-appellants’ judgments of conviction are affirmed, the jury’s findings that the defendants-appellants are responsible for the murder of Anthony Venditti and the attempted murder of Kathleen Burke are vacated, the defendants-appellants’ sentences on Counts 1 and 2 are vacated, the sentences on Counts 3-6 are affirmed, and the case is remanded for resentencing on Counts 1 and 2 consistent with this opinion.

. On another occasion, Giovanelli’s defense counsel was twice held in contempt for reasons not directly related to the prohibition against referring to prior trials. Ultimately, an appeal was taken that resulted in the reversal of one of those contempts and the affirmance of the other. See United States v. Giovanelli, 897 F.2d *484 1227, 1229 (2d Cir.), cert. denied, -U.S. -, 111 S.Ct. 72, 112 L.Ed.2d 46 (1990).