**UNITED STATES of America, Appellee,**

v.

**Nicholas MAURO, Defendant–Appellant.**

**No. 513, Docket 95–1025.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1995.

Decided April 2, 1996.

Anthony M. Bruce, Assistant United States Attorney, Buffalo, New York (Patrick H. NeMoyer, United States Attorney for the Western District of New York, John E. Rogowski, Assistant United States Attorney, of counsel; David J. Byrne, Law Clerk, on the brief), for Appellee.

Kenneth F. Hense, Point Pleasant, New Jersey (McGlynn, Reed, Hense & Pecora, Point Pleasant, New Jersey, Joseph S. Pecora, Jr., of counsel), for Defendant–Appellant.

Before: LUMBARD, MAHONEY and LEVAL, Circuit Judges.

LUMBARD, Circuit Judge:

Nicholas Mauro appeals from a judgment of conviction filed on December 28, 1994, in the Western District of New York (William M. Skretny, *Judge*). A September 17, 1992 indictment charged Mauro with six counts relating to his participation in a scheme to defraud various federal and state agencies ("the fraud counts") and four counts concerning his participation in an illegal gambling business, two arising under 18 U.S.C. § 1955 ("the bookmaking counts") and two arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("the RICO counts"). On March 17, 1993, the court granted Mauro's motion to sever trial of the fraud counts from trial of the bookmaking and RICO counts.

On February 4, 1994, after a four-day trial on the fraud counts, a jury convicted Mauro of all six counts. On March 28, 1994, after a six-week trial on the bookmaking and RICO counts, a second jury convicted Mauro and two co-defendants of both bookmaking counts and convicted Mauro of both RICO counts.[1] On January 6, 1995, the court sentenced Mauro to sixty months' imprisonment on

---

1. The September 17, 1992 indictment also named Frank Stasio, Peter Spero, Mike Giancarlo, Ben Rogers, Joseph Giallella, and Timothy Spero in the bookmaking counts. Peter Spero and Mike Giancarlo pleaded guilty before trial and testified for the government. The case against Timothy Spero, Peter Spero's son, was dismissed as a result of his father's plea. Stasio, Giallella, and Rogers stood trial with Mauro before the second jury. The jury acquitted Rogers and convicted Stasio and Giallella of both bookmaking counts.

each of the fraud counts and on each of the bookmaking counts and to 168 months' imprisonment on each of the RICO counts, all terms to run concurrently, to be followed by two years of supervised release. The court imposed a $50 assessment on each count.

Mauro appeals from his conviction of the fraud counts on the ground that the court should not have admitted evidence of his prior incarceration and should have granted his motion for a continuance so that he could introduce additional evidence. He also challenges the sufficiency of the evidence and the correctness of the jury instructions on the RICO counts. We affirm.

## I.

### A. The Fraud Trial

The fraud counts charged Mauro with devising a scheme to place his son Charles on the payroll of Atlas Auto Glass ("Atlas"), in violation of 18 U.S.C. § 1341 (mail fraud), 42 U.S.C. § 408(a)(1)(A) (making false statements to the Social Security Administration), and 18 U.S.C. §§ 2, 371 (conspiring to defraud the United States). Nicholas Bolognese and Ronald Smyntek, the co-owners of Atlas, were the government's principal witnesses and both received immunity from prosecution.

Bolognese testified that Mauro convinced him to place his son Charles Mauro on the payroll of Atlas Auto Glass as a "no-show" employee so that Charles would have health insurance. Over Mauro's objection, the court permitted Bolognese to reveal that these discussions took place in the Erie County Holding Center, where Mauro was then incarcerated. Beginning April 1, 1986, Atlas paid Charles $500 a week, issuing a $340 payroll check and withholding $160 in federal and state taxes. Charles or his father then repaid Atlas $500 each week in cash. Bolognese and Smyntek kept the cash without reporting it as income, while Atlas claimed a deduction for Charles's wages on its federal and state tax returns. Charles remained on Atlas's payroll until April 16, 1990, when an FBI investigation prompted his termination. As a result of his job with Atlas, Charles

later qualified for $7,700 in state unemployment benefits.

On cross-examination, counsel asked Bolognese whether he had ever placed any other no-show employees on the Atlas payroll. Bolognese denied ever doing so. Smyntek later testified that Bolognese had in fact placed his girlfriend Maryann Shipkowski (now Bolognese's wife) on the payroll as a no-show employee to obtain health insurance for her. After the government rested, Mauro sought a continuance in order to subpoena Shipkowski. He intended to show that Bolognese had placed her on the payroll before Charles, thereby proving that Bolognese had first hatched the payroll scheme. The court denied Mauro's request. The defense presented no evidence.

On February 4, 1994, the jury convicted Mauro of all six counts. The court denied Mauro's post-trial motions for judgment of acquittal and a new trial.

### B. The Bookmaking and RICO Trial

The bookmaking counts charged Mauro with conspiring to conduct and conducting an illegal gambling business, in violation of 18 U.S.C. §§ 371 and 1955. The first RICO count charged him with participating in a racketeering enterprise by committing four predicate acts: the gambling business and three instances of using and conspiring to use extortionate means to collect bookmaking debts in violation of 18 U.S.C. § 894, all in violation of 18 U.S.C. §§ 1962(c), 2, and 1963. The second RICO count charged Mauro with conspiring to conduct a racketeering enterprise by agreeing to commit the same four racketeering acts charged in the first RICO count, and alternatively with participating in a racketeering enterprise by conspiring to collect an "unlawful debt," in violation of 18 U.S.C. §§ 1962(d) and 1963.

The Government introduced over two hundred wiretap recordings, physical evidence, and the testimony of several witnesses to establish that Mauro was the head of a bookmaking enterprise employing at least twenty-three people and booking substantial wagers on sporting events. The evidence also showed that Mauro had used extortionate means to collect gambling debts from Ronald

Raccuia, Michael Graziadei and Charles Galioto and that he had attempted to collect an "unlawful debt" from Galioto.

In 1981, Raccuia ran up a $3,200 bookmaking debt to Mauro's principal bookmaking writer, Peter Spero, who in turn owed the money to Mauro. When Spero proved unable to collect the debt, Mauro arranged a meeting with Raccuia and Spero. Mauro advised Raccuia to "go on the arm" to get the money—to borrow from the mob—or else he would "kick the f—kin' s—t outta [him]" and "give [him] a crack right in [his] f—kin' mouth."

In 1982, Graziadei, another of Mauro's customers, told Mauro that he was unable to honor his $10,000 bookmaking debt. Mauro responded by grabbing him, sticking a knife or a fork to his throat, and verbally threatening him.

Galioto was an independent bookmaker who hedged his exposure by laying off bets placed by his customers with Mauro through Gordolfo DelGaudio, one of Mauro's agents. In January or February of 1990, Galioto was unable to collect from two of his customers whose bets he had hedged by betting with Mauro. DelGaudio telephoned Galioto several times and made veiled threats in Mauro's name to collect the $8,000 that Galioto owed Mauro. When these efforts failed, Mauro summoned Galioto to the Nickel City Cafe, "pointed a finger across the table and [told Galioto that] one way or another [the debt]'s getting f—king paid." Galioto testified that there was "no doubt in his mind" that Mauro had threatened him with physical harm. Mauro did not testify.

The jury found all four predicate acts proven and convicted Mauro of all four counts; with regard to the second RICO count, the jury found both theories of conviction proven. Finding the evidence sufficient, the court denied Mauro's post-trial motion for acquittal.

## II.

Since Mauro has not appealed from his conviction of the bookmaking counts, the government invites us not to review his conviction of the fraud counts under the concurrent sentence doctrine because a reversal on those counts will not reduce his overall term of imprisonment. *See United States v. Vargas,* 615 F.2d 952, 956–60 (2d Cir.1980). Mauro, however, is not serving concurrent sentences because the court imposed a $50 special assessment on each count pursuant to 18 U.S.C. § 3013. *See Ray v. United States,* 481 U.S. 736, 737, 107 S.Ct. 2093, 2093–94, 95 L.Ed.2d 693 (1987).

■ Mauro complains that the court should not have permitted the government to disclose that he was incarcerated when he met with Nicholas Bolognese. At trial, the government intimated that Mauro had asked Bolognese to put Charles on the payroll because his interest in securing health insurance for his son was heightened by his incarceration. Evidence of other crimes is admissible to prove motive as long as its probative value is not substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403, 404(b). The court permitted the government only to reveal that Mauro was in prison, and not the reason for his incarceration. *See United States v. Robinson,* 956 F.2d 1388, 1397 (7th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992). Mauro was given advance notice of the government's intention to introduce this evidence. The court also cautioned the jury that Mauro's incarceration was not to be considered as proof of criminal propensity, but only as background information and as proof of motive. Although the probative value of Mauro's incarceration was slight and may have been outweighed by the prejudice, we conclude that the admission of the evidence was not an abuse of discretion. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

■ Mauro also challenges the court's denial of his request for a continuance to subpoena Shipkowski. The court originally refused to do so because defense counsel could not find a specific statement in Bolognese's testimony that Mauro wished to impeach. Ruling on Mauro's post-trial motion for a new trial, the court conceded that Shipkowski's testimony would have supported Mau-

ro's claim that Bolognese had thought up the payroll scheme; it proceeded nevertheless to deny Mauro's request in light of the "marginal relevance" of the proffered testimony and the "unnecessary delay" a continuance would have caused. It also suggested that such extrinsic evidence would not have been independently admissible for the purpose of impeaching her husband's credibility under Federal Rule of Evidence 608(b). *But see United States v. Garcia,* 900 F.2d 571, 575 (2d Cir.) (discussing "impeachment by contradiction"), *cert. denied,* 498 U.S. 862, 111 S.Ct. 169, 112 L.Ed.2d 133 (1990); *United States v. Benedetto,* 571 F.2d 1246, 1250–51 (2d Cir.1978). We agree that the relevance of Shipkowski's testimony was marginal because Smyntek's testimony already suggested that Bolognese may have thought up the payroll scheme on his own. The court properly exercised its discretion in denying Mauro's motion for a continuance.

### III.

■ Mauro challenges the sufficiency of the evidence offered at his trial on the bookmaking and RICO counts on several grounds. First, he claims that the government did not adduce sufficient evidence to prove the existence of the racketeering enterprise charged in the indictment. The indictment alleged that "[f]rom sometime prior to April 16, 1981 and continuing hereafter to on or about April 30, 1990," there existed "a group of individuals associated in fact" consisting of "Nicholas Mauro, and Peter Spero, together with Charles Mauro, and Gordolfo DelGaudio, and others both known and unknown," who were engaged in "running and financing a bookmaking enterprise, and collecting monies from customers of the bookmaking enterprise."

■ Mauro claims that the evidence at best proved the existence of two separate enterprises, one which ended in 1986 a few months after he went to prison (Mauro's incarceration in 1985 was not disclosed to the second jury), and one which began in August of 1988 shortly after his release. Spero testified that up until 1985, he and Mauro were associated in a bookmaking operation with Jack Fasanella, Charles Mauro, and other individuals. After Mauro "left town," Charles took over the operation. Spero and Fasanella left the organization in January of 1986, and refused to communicate with Mauro or his son. Mauro claims the enterprise folded at this time. After his release in August 1988, Mauro claims that he, his son Charles, Spero, Fasanella, and DelGaudio began running a second, unrelated bookmaking operation. Evidence of changes in membership, however, do not compel a finding that the two operations were unrelated as a matter of law. *See United States v. Coonan,* 938 F.2d 1553, 1560–61 (2d Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). The jury could reasonably infer that Charles took over the bookmaking operation during his father's absence and that Mauro later resumed his role.

In addition, two former customers of Mauro's operation, Chester DelBello and Dr. George Barrios, testified that Mauro's agents regularly took bets throughout the period alleged in the indictment. Delbello testified that he "continue[d] to bet with Mr. Mauro's operations throughout the 1980s," originally settling his account with Mauro himself, but settling with Charles while "Nick was away." Likewise, Barrios testified that he placed bets and settled his account with Fasanella and another of Mauro's agents "between the early '80s and somewhere in the '90s." There was sufficient evidence of an ongoing organization whose associates functioned as a unit. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981); *United States v. Orena,* 32 F.3d 704, 711 (2d Cir.1994). Mauro has not met his "heavy burden." *See United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir. 1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).

■ Second, Mauro challenges the sufficiency of the evidence supporting the jury's finding that he had used extortionate means to collect debts from Raccuia and Galioto. An "extortionate means" is "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7). The testimony of Raccuia,

Spero, Galioto, and DelGaudio, together with the wiretapped recordings produced at trial, sufficed for the jury to find that Mauro had threatened Raccuia and Galioto with physical harm if they did not honor their debts.

█ Third, Mauro contests the sufficiency of the evidence establishing that he had attempted to collect a debt or extension of credit from Galioto. *See* 18 U.S.C. §§ 894, 1962(c). He contends that the evidence regarding his efforts amounted to no more than an attempt to obtain an "intraorganization transfer of funds." *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir.1991). We disagree. Although "the transmission of money within an organization, regardless of that organization's legality, does not constitute collection of a debt," *id.* at 490, an obligation incurred in a layoff relationship is more analogous to a personal wager.[2] *See id.* (holding that the collection of debts resulting from personal wagers placed by employees of a gambling business constitutes "collection of unlawful debt" within the meaning of § 1962(c)). Galioto was an independent bookmaker who offset some of his risks by hedging his bets with Mauro's business. He testified that he alone, and not his customers, was personally responsible to Mauro for satisfaction of the debt. There was sufficient evidence for the jury to find that the money Galioto owed Mauro was an "unlawful debt" under 18 U.S.C. § 1962(c) and an "extension of credit" under 18 U.S.C. § 894.

## IV.

Mauro complains that the court improperly instructed the jury that it could find him guilty of the first racketeering act and of the alternate theory of conviction charged in the second RICO count based on a violation of N.Y.Penal Law § 225.05. We need not address this argument because there was sufficient evidence that Mauro committed three

of the four racketeering acts charged under both RICO counts.

Affirmed.

---

2. Mauro reasons that a debt incurred in a layoff relationship is an "intraorganization transfer of funds" because anyone who lays off bets with a bookmaking operation is an agent of that operation. *See, e.g., United States v. Grezo*, 566 F.2d 854, 857, 859–60 (2d Cir.1977) (holding that "agents, runners, 'independent contractors,' salesmen" and layoff bettors are all "conduc-

tors" of a gambling business for the purposes of 18 U.S.C. § 1955). Regardless of whether Galioto is an agent of Mauro's enterprise, our holding in *Giovanelli* does not immunize all obligations between members of a enterprise from prosecution under RICO, but only those which amount to "no more than the intraorganization transfer of funds." 945 F.2d at 490.